## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LIONEL ALLEN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-4047 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| BRIAN BENTON, MARC REID, and | ) | |
| THE CITY OF JOLIET, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

### <u>ORDER</u>

Plaintiff Lionel Allen, a black police officer, began working for the Joliet Police Department in 1989. He served and protected the community for three decades. In December 2015, the Department moved Allen to patrol a new part of Joliet, and replaced him with a white officer named Michael Cochran.

That change didn't sit well with Allen. And it wasn't simply because Allen was getting a change of scenery. He didn't think much of Cochran, and he made a comment that Cochran was a racist. That comment triggered an investigation. The Department treated his remark as a complaint, and Defendant Lieutenant Marc Reid investigated Cochran. He found no support for Allen's claim.

At that point, Cochran turned around and complained about Allen, for falsely accusing him of making racist remarks. That complaint triggered a second investigation. This time, Lieutenant Reid investigated Allen. While the investigation was ongoing, Allen filed an EEOC charge, believing that Lieutenant Reid investigated him because of his race.

Lieutenant Reid sustained the complaint against Allen for making false statements. Allen had a disciplinary hearing with the Chief of Police – Defendant Brian Benton – and others. Chief Benton offered Allen a Last Chance Agreement. The agreement expressly required Allen to drop the EEOC complaint, or face termination. It gave him a 15-day suspension, too. Allen signed the agreement, dropped the complaint, and received the suspension. He then worked in his new sector until he left the Police Department in 2018.

Before leaving the force, Allen sued the City of Joliet and Officers Brian Benton and Marc Reid. He brought discrimination and retaliation claims under 42 U.S.C. § 1981 and Title VII. After discovery, the parties filed cross motions for summary judgment. Allen moved for partial summary judgment on the retaliation claims. Defendants, in turn, moved for summary judgment on all claims.

For the reasons that follow, this Court denies Allen's motion for partial summary judgment, and grants in part and denies in part Defendants' motion for summary judgment.

## Non-Compliance with the Rules

Before diving into the record, the Court must begin by calling attention to Allen's failure to comply with the Local Rules.

The Local Rules require parties to follow a specific procedure when filing and opposing a motion for summary judgment. The Rules exist for good reason. The Rules are designed to give district courts the information they need to ferret out if there needs to be a trial. Compliance is necessary for the smooth, efficient operation of the judicial system, especially given the volume and complexity of summary judgment motions. The uniformity of the procedure – across all cases – helps district courts manage a pile of motions in a mountain of cases.

All litigants must follow the Local Rules or face the consequences of non-compliance. Substantial compliance with Local Rule 56.1 is not enough. *See Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004). A district court can require strict compliance by the parties. *See Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015); *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561–62 (7th Cir. 2002).

Local Rule 56.1 governs the procedures for filing a motion for summary judgment. The moving party must provide a "statement of material facts that complies with LR 56.1(d) and that attaches the cited evidentiary material." *See* L.R. 56.1(a)(2). That statement of facts must rest on evidence in the record, with user-friendly citations. "Each asserted fact must be supported by citation to the specific evidentiary material, including the specific page number, that supports it." *See* L.R. 56.1(d)(2). A district court "may disregard any asserted fact that is not supported with such a citation." *Id.* A fact without evidence isn't a fact.

The moving party must submit the evidence that supports each of the proposed facts. "All evidentiary material identified in LR 56.1(a)(2) and LR 56.1(b)(3) citations must be included as numbered exhibits with the statements of fact." *See* L.R. 56.1(d)(3).

Local Rule 56.1 also explains how to respond to a motion for summary judgment. The non-moving party must file a "response to the LR 56.1(a)(2) statement of material facts that complies with LR 56.1(e)." *See* L.R. 56.1(b)(2). That response "must consist of numbered paragraphs corresponding to the numbered paragraphs" of the movant's statement of facts. *See* L.R. 56.1(e)(1).

The non-movant must confront the statement of facts head-on. "Each response must admit the asserted fact, dispute the asserted fact, or admit in part and dispute in part the asserted fact." *See* L.R. 56.1(e)(2).

But it is not enough to say that a fact is disputed, without more. "To dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact." *See* L.R. 56.1(e)(3). Notice the words: the non-movant must "cite" evidence – "*specific*" evidence – and "explain" why it matters. *Id.* (emphasis added). Otherwise, the non-movant has not "dispute[d]" the movant's facts. *Id.*

A failure to offer contrary evidence means that there is nothing on the other side of the evidentiary scale. So the movant's facts are unopposed. "Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." *Id.* "[M]ere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material." *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

The Local Rules also allow the non-moving party to supplement the record with additional facts. The non-moving party must file a statement of additional facts and "attach[] any cited evidentiary material." *See* L.R. 56.1(b)(3).

Allen's filings suffered from a few problems. Some large, some small (relatively speaking, that is).

The Court will start with the lesser problem. In his response to Defendants' statement of facts, Allen did not cite evidence. At least not directly. Instead, he cited his own statement of additional facts. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 2–3, 5–9, 11, 13, 31, 35, 38, 43, 49, 51–52, 56–59, 61–64 (Dckt. No. 77). His filing pointed to his *other* filing.

At first blush, that approach might seem like no big deal. But in practice, it substantially delayed and encumbered this Court's deep dive into the record. Instead of pointing this Court to evidence, Allen pointed this Court to another document, which, in turn, (supposedly) cited to the

4

countervailing evidence. It added a step, and forced this Court to compare two different documents simply to figure out where to look to find the evidence in the record.

For example, paragraph two of Defendants' statement of facts addressed the collective bargaining agreements at the Joliet Police Department. In response, Allen did not come forward with evidence. Instead, Allen cited paragraph 29 of Allen's statement of additional facts. *Id.* at ¶ 2. That citation required this Court to look at paragraph 29 of that document, and then see those citations before finding the underlying evidence.

In isolation, that approach might not seem problematic. But afterwhile, it bogged down the Court's review. Paragraph 3 of Plaintiff's response pointed to paragraphs 11 and 29 of Plaintiff's statement of additional facts. *Id.* at ¶ 3. Paragraph 5 of Plaintiff's response pointed to paragraph 3 of Plaintiff's statement of additional facts. *Id.* at ¶ 5. Paragraph 8 of Plaintiff's response pointed to paragraphs 8 and 30 of Plaintiff's statement of additional facts. *Id.* at ¶ 8. And so on.

The ping-pong approach slowed down this Court's review. A better approach is the direct approach, which is what Local Rule 56.1 requires. The non-moving party must cite *evidence*, not point to another document that cites evidence. *See* L.R. 56.1(e)(3) ("To dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact.").

A bigger problem is the lack of evidence. All too often, when this Court drilled down to unearth the underlying evidence, instead of hitting paydirt, the Court came up empty. Time and again, Allen pointed to material that didn't actually contradict the evidence put forward by Defendants.

Consider the following example. In their statement of facts, Defendants included the following paragraph: "When making disciplinary decisions for police officers, Chief Benton's intent was to fairly administer discipline in a consistent manner pursuant to just cause principles. When doing so, Chief Benton would often take into consideration the officer's past discipline as well as Chief Benton's understanding of the just cause standard in the collective bargaining agreements." *See* Defs.' Statement of Facts, at ¶ 3 (Dckt. No. 64).

Allen responded by citing to paragraphs 11 and 29 of his statement of additional facts. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 3 (Dckt. No. 77). After jumping to paragraph 11, this Court found a statement that Allen's expert "concluded that Benton and the Department's discipline and treatment of Allen was disparate and illegally motivated by Allen's race and prior protected activities." *See* Pl.'s Statement of Additional Facts, at ¶ 11 (Dckt. No. 77) (citing Porcher Expert Report, at 30–40 (Dckt. No. 78)). That's a legal conclusion by an expert, and "expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible." *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003). So paragraph 11 doesn't help Allen.

Paragraph 29 doesn't lend a hand, either. Paragraph 29 says that the expert report was "based upon and supported by additional case materials," citing generally to almost 100 pages of various depositions and a 108-page exhibit. *See* Pl.'s Statement of Additional Facts, at ¶ 29 (Dckt. No. 77). But the Local Rules require a "citation to the specific evidentiary material, including the specific page number, that support it." *See* L.R. 56.1(d)(2). "A court should not be expected to review a lengthy record for facts that a party could have easily identified with greater particularity." *Ammons*, 368 F.3d at 818. Citations to everything are citations to nothing.

That example is not an isolated aberration. Far from it. Time after time, Allen cited material that did not call into question the fact put forward by Defendants. *See, e.g.*, Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 2 (Dckt. No. 77) (citing Pl.'s Statement of Facts, at ¶ 29 (Dckt No. 77), which provides nearly 200 pages of mostly unrelated documents); *id.* at ¶ 5 (citing Pl.'s Statement of Facts, at ¶ 3, which does not directly address Defendants' asserted fact); *id.* at ¶ 7 (citing Pl.'s Statement of Facts, at ¶ 30, which does not directly address Defendants' asserted fact); *id.* at ¶ 9 (citing Pl.'s Statement of Facts, at ¶¶ 11, 29, which provide a legal conclusion by an expert and nearly 200 pages of documents); *id.* at ¶ 11 (citing Pl.'s Statement of Facts, at ¶¶ 32, 34, which do not directly address Defendants' asserted fact); *id.* at ¶ 13 (citing Pl.'s Statement of Facts, at ¶ 29, which provides nearly 200 pages of mostly unrelated documents); *id.* at ¶ 17 (citing nothing); *id.* at ¶ 38 (citing Pl.'s Statement of Facts, at ¶¶ 3–4, 6–10, which do not directly address Defendants' asserted fact); *id.* at ¶ 52 (citing Pl.'s Statement of Facts, at ¶ 9, which partially supports Defendants' asserted fact).

That's a lot of citations, but not a lot of on-point evidence. Plaintiff pointed this Court to evidence, and after exploring the record, this Court found a lot of empty holes. So the Court treats as admitted Defendants' facts that are supported by admissible evidence. *See* Defs.' Statement of Facts, at ¶¶ 2–3, 5–9, 11, 13, 17, 31, 35, 38, 43, 49, 51–52, 56–59, 61–64 (Dckt. No. 64). Allen did not dispute the remaining paragraphs from Defendants' statement of facts, so those paragraphs are deemed admitted.

In a similar vein, Allen's statement of additional facts suffered from a number of problems. Allen supported the first 28 paragraphs of his statement of facts with citations to his expert report, and nothing else. *See* Pl.'s Statement of Additional Facts, at ¶¶ 1–28 (Dckt. No. 77); *see also* Porcher Report (Dckt. No. 78). But an expert report is an out-of-court

statement, and if it is offered for its truth, it is hearsay. *See Mathis v. Carter*, 2017 WL 56631, at *4–5 (N.D. Ill. 2017); *Henriksen v. United States*, 2011 WL 13239142, at *1 (N.D. Ill. 2011); *see also J.P. Morgan Chase Bank, N.A. v. Jenkins*, 2016 WL 4417072, at *2 (N.D. Ill. 2016) ("The report, however, is undated, unsigned, and unsworn, and thus is not admissible to oppose summary judgment.") (citing *Wittmer v. Peters*, 87 F.3d 916, 917 (7th Cir. 1996)). "A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979. 985 (7th Cir. 2009).

An expert report isn't evidence. It isn't testimony. It's a disclosure document. *See* Fed. R. Civ. P. 26(a)(2)(B). It's a preview of what the expert would say at trial, if given the chance to testify. *See Henricksen*, 2011 WL 13239142, at *1 ("The purpose of an expert report is to facilitate an effective cross-examination, minimize the expense of deposing experts, shorten the direct examination, and prevent ambush at trial.") (cleaned up).

After Defendants objected to the report as hearsay, Allen filed a motion to supplement the record, which the Court granted. *See* 10/28/21 Order (Dckt. No. 100). Allen then submitted a declaration from his expert, who stated that he "would testify in accordance with the facts, conclusions, and opinions in [his] report." *See* Porcher Dec., at ¶ 3 (Dckt. No. 99-1). That's a sufficient cure.

A party who wants to rely on an expert report at the summary judgment stage must come forward with an affidavit or declaration from the expert. In the affidavit or declaration, the expert must confirm that he or she would testify consistent with the expert report at trial. *See Munoz v. Menard, Inc.*, 2019 WL 1773356, at *2 (N.D. Ill. 2019); *Piotrowski v. Menard, Inc.*, 2015 WL 5139415, at *4 n.3 (N.D. Ill. 2015); *Clara v. City of Chicago*, 2002 WL1553419, at *8 (N.D. Ill. 2002). *That's* testimony.

8

But there is a bigger problem here. Allen does not cite anything to support the first 28 paragraphs of his statement of additional facts, except his expert report. *See* Pl.'s Statement of Additional Facts, at ¶¶ 1–28 (Dckt. No. 77). Those 28 paragraphs summarized the facts of the case, at great length.

An expert can rely on facts in (and outside) the record when forming his or her opinions. *See* Fed. R. Evid. 703. But an expert must do more than summarize the evidence, and then declare a legal conclusion. *See Good Shepherd Manor Found., Inc.*, 323 F.3d at 564; Fed. R. Evid. 702 (setting out the requirements for admissible expert testimony). "An expert who parrots an out-of-court statement is not giving expert testimony; he is a ventriloquist's dummy." *See United States v. Brownlee*, 744 F.3d 479, 482 (7th Cir. 2014); *see also United States v. Smith*, 869 F.2d 348, 355 (7th Cir. 1989) ("It is, of course, true than an expert witness may not simply summarize the out-of-court statements of others as his testimony."); *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005) ("[W]hile Rule 703 was intended to liberalize the rules relating to expert testimony, it was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion.").

A jury doesn't need an expert to summarize the testimony from the witnesses. The jury can hear the witnesses for themselves. There is no value-add by summarizing the record, and then stamping it with the expert's legal conclusion.

And most importantly, from a summary judgment perspective, citing the expert report in blanket fashion inhibits this Court's review of the underlying evidence. Paragraphs 5–28 of Plaintiff's statement of additional facts cited pages 30–40 of the expert report. *See* Pl.'s

Statement of Additional Facts, at ¶¶ 5–28 (Dckt. No. 77). That's the entire opinion section of his report, *en masse*.

Pages 30–40 of the expert report disclosed six opinions, and summarized deposition testimony at great length, in 11 single-spaced pages. The cinder block created a near-impenetrable barrier that prevented this Court from having any meaningful review of the testimony.

For example, consider paragraph 7 of Plaintiff's statement of additional facts. Allen offered the following fact:

> 7. Reid cherry picked evidence during his investigation of Allen in 2016. Reid investigated Allen after Plaintiff vented during rollcall about the Department giving Allen's sector assignment to Cochran and Defendants doing nothing about Breen's known harassment of Allen. Reid failed to consider or completely dismissed Officer Cochran's documented and known history of racial insensitivity as an Officer, including without limitation: (a) Officer Cochran's testimony that he used racial slurs off-duty and has heard racial slurs including the "N" word from other officers; (b) Officer Cochran's prior suspension for yelling at a black mother and her child, "What the fuc# are you doing, can't you see the road is closed"; (c) Officer Cochran's suspension for slapping a black juvenile in the face while the young man was handcuffed in the back of his squad car; (d) Officer Cochran's permanent prohibition from working at the Rialto Theatre in Joliet after using excessive force in the removal of a black patron from the premises; (e) Officer Cochran's joking about a biracial child whose mother was black and father was in the Aryan Brotherhood; (f) Officer Cochran's joking on the police radio about his lookout for the "chicken thieves", two black men who were suspected of stealing fried chicken; (g) Officer Cochran smiling at Allen while Cochran pepper-sprayed a crowd of black children and their parents; (h) Officer Cochran offering to throw a passed out black man in a shopping cart to remove him from the Wal Mart; and (i) Officer Cochran referring to a black officer on the force as big, black, and sexy. (*Id.*).

*See* Pl.'s Statement of Additional Facts, at ¶ 7 (Dckt. No. 77).

The citation ("*Id.*") is to pages 30–40 of the expert report. *Id.* So, if this Court wants to figure out if there is evidence supporting that paragraph, this Court needs to read the entire

opinion section of the expert report. And then, this Court needs to hunt for specific pages, and see if they match the content of the statement of additional facts. And even if this Court found a match, this Court would need to dig deeper, and see if there is any evidentiary support for what the *expert* had to say. Again, the expert largely summarized deposition testimony, so this Court would need to find, read, and review the underlying testimony to see if it supported the expert.

Allen stuffed too many facts into that paragraph, too. The Local Rules may not impose a strict one-fact-per-paragraph approach. But they do require each paragraph to be "concise." *See* L.R. 56.1(d)(1). A concise paragraph is easy to read, and it is simple to check if the evidence supports it. But an encyclopedic paragraph is not. Here, Allen overloaded each paragraph with too much content, rendering it undigestible.

Paragraph seven is a perfect example. Allen purported to give nine separate examples of discriminatory acts by Cochran. Each example involved a different incident. So each incident would require evidentiary support, meaning deposition testimony, a declaration, or something else. Forcing nine examples into a single paragraph floods the zone, making it too difficult to evaluate whether there is evidentiary support in the record.

Rule 56.1 envisions a simple process for offering additional facts. The non-movant can supplement the record by offering a statement of additional facts, and "must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact." *See* L.R. 56.1(e)(3). The non-movant must cite "*specific*" evidence so that the Court can find it. *Id.* (emphasis added). It should be – and must be – user friendly. But here, Allen put this Court on a wild goose chase, which accomplished nothing except getting lost.

11

Instead of citing "specific" evidence, as the Local Rules expressly require, Plaintiff cited an expert report *writ large*. *See* L.R. 56.1(e)(3). By taking that approach, Plaintiff failed to put the evidence on the table in a digestible format. This Court strikes paragraphs 1–28 of Plaintiff's statement of additional facts for failure to comply with the Local Rules.

### Background

Plaintiff Lionel Allen served the public for three decades. He worked for the City of Joliet as a police officer from 1989 until 2019. *See* Defs.' Statement of Facts, at ¶ 12 (Dckt. No. 64). He is African American. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 1 (Dckt. No. 75).

Allen's complaints begin in 2015. At that time, the individual Defendants – Brian Benton and Marc Reid – were two of Allen's superiors. Defendant Brian Benton was the Chief of Police, holding that role from 2013 through 2018. *See* Defs.' Statement of Facts, at ¶ 1 (Dckt. No. 64). Defendant Marc Reid was a Lieutenant in the Police Department's Internal Affairs Division, holding that position from 2012 to 2018. *Id.* at ¶ 4.

This dispute started with a sector assignment, which is the area that a patrol officer covers. *Id.* at ¶ 19. Watch Commanders or Lieutenants make the assignments on a yearly basis. *Id.*

A sector assignment only affects where an officer works. Officers perform the same duties listed in their job description and receive the same pay, regardless of where they work. *Id.* at ¶ 20. Officers can request a specific sector, but they may not get what they want. *Id.* at ¶ 21. Watch Commanders and Lieutenants have complete discretion over which officers patrol what areas. *Id.*

In 2015, Allen worked in sector 21.[1]  *Id.* at ¶ 25.  At that time, Officer Michael Cochran worked in sector 25.[2]  *Id.* at ¶ 26.  But Cochran felt burnt out from his work there, and requested a reassignment to sector 21 sometime in November 2015.  *Id.*  He made that request to Sergeant Matt Breen.  *Id.*

At a holiday party, Lieutenant Kevin LaBolle – one of the Lieutenants responsible for making the sector assignments – told Allen that he planned to move Cochran to sector 21 and shift Allen to a sector called "central cover."[3]  *Id.* at ¶ 27.  At Allen's next roll call, he received the same news from Sergeant Patrick Cardell.  *Id.* at ¶ 28; *see also* Breen Dep., at 123:1-5 (Dckt. No. 65, at 186 of 233).

Allen didn't like the move.  Specifically, he didn't like the guy who replaced him.  At roll call, in front of around seven to ten people, Allen expressed his discontent.  He said that the department gave his sector "to the guy that cracks all the racist jokes."  *See* Defs.' Statement of Facts, at ¶ 29 (Dckt. No. 64).

Sergeant Breen took Allen's words as a complaint.  He testified that "[i]f somebody is claiming somebody is making those jokes and those slurs and accusing somebody of that, I am required to document that and send it upstairs."  *See* Breen Dep., at 140:13-16 (Dckt. No. 65, at 190 of 233); *see also* Defs.' Statement of Facts, at ¶ 32 (Dckt. No. 64).

---

[1]  The parties don't say where sector 21 is, but the Joliet Police Department website places it in the northeast section of the city's central district.  *See Central District Sector Maps*, Joliet Police Department, https://www.joliet.gov/departments/police-department/resources/sector-maps/central-district-sector-maps (last viewed February 24, 2022).

[2]  Based on the map, sector 25 was in the southwest section of the city's central district.  *See Central District Sector Maps*, Joliet Police Department, https://www.joliet.gov/departments/police-department/resources/sector-maps/central-district-sector-maps (last viewed February 24, 2022).

[3]  Central cover includes sectors 21 through 25 and a cover car.  *See* Breen Dep., at 66:10-17 (Dckt. No. 65, at 180 of 233).

So Sergeant Breen contacted Lieutenant Dennis McWherter and told him what had happened. *See* Defs.' Statement of Facts, at ¶ 33 (Dckt. No. 64). Sergeant Breen also said that he would write up the allegation by Allen and send it to Internal Affairs to investigate as a harassment complaint. *Id.*

Later that day, Sergeant Breen, Sergeant Cardell, and Lieutenant McWherter met with Allen. *Id.* at ¶ 34. Sergeant Breen told Allen that he documented his comments and would send them to Internal Affairs. *Id.* Allen told Sergeant Breen that he had heard Cochran make racial jokes 15 to 40 times in his presence. *Id.*

Sergeant Breen filled out a complaint form and provided it to Internal Affairs. *Id.* at ¶ 36. Then, Lieutenant Reid investigated Allen's complaint. *Id.* at ¶ 37. He interviewed over 30 employees to determine whether anyone could confirm Allen's allegations. *Id.* at ¶ 38.

Lieutenant Reid also interviewed Allen. He asked about Allen's interactions with Cochran and the specific jokes that Cochran made in his presence. *Id.* at ¶ 39. But Allen couldn't remember any specific jokes at that time. *Id.*

In the end, Lieutenant Reid determined that Allen's allegations were unfounded. *Id.* at ¶ 40; *see also* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 40 (Dckt. No. 77) (admitting that it is "[u]ncontested" that "Reid concluded that the allegations involving Officer Cochran were unfounded").

Cochran then turned the tables. Cochran filed a complaint with Internal Affairs against *Allen*, alleging that his accusation violated the Police Department's policies prohibiting officers from making malicious, harassing, or frivolous complaints against fellow members of the department. *See* Defs.' Statement of Facts, at ¶ 41 (Dckt. No. 64); Pl.'s Resp. to Defs.' Statement of Additional Facts, at ¶ 1 (Dckt. No. 98). Chief Benton added a charge of "conduct

14

unbecoming," which includes making false statements.  *See* Defs.' Statement of Facts, at ¶¶ 52–53.  (He apparently wanted to avoid an explicit untruthfulness charge from adversely affecting Allen's credibility at criminal trials.  *Id.* at ¶ 52.)

So the accuser became the accused (and vice versa).  For the second time, Lieutenant Reid opened an investigation.  Lieutenant Reid investigated Cochran's complaint against Allen, just like he investigated Allen's complaint against Cochran.  He interviewed Allen a second time. *Id.* at ¶ 42; Pl.'s Resp. to Defs.' Statement of Additional Facts, at ¶ 2 (Dckt. No. 98).  This time, though, Allen could remember four separate incidents when Cochran allegedly made racist comments.  *See* Defs.' Statement of Facts, at ¶ 43 (Dckt. No. 64).

On one occasion, after two black individuals stole fried chicken from a Jewel, Cochran said over air, "I am going to go look for the chicken thieves."  *Id.* at ¶ 44.  Another time, Cochran responded to a black woman who reported abuse by her white supremacist boyfriend.  *Id.* at ¶ 45. Cochran joked that he "bet [] it's funny for him to explain to his brotherhood . . . that his baby mama was black."  *Id.*  Third, Allen watched Cochran mace a group of black children and "make[] a funny face because they were crying."  *Id.* at ¶ 46.  And in the final example, Cochran reportedly called another black officer "big, black and sexy."  *Id.* at ¶ 47.

While the investigation was ongoing, Allen filed an EEOC charge on May 4, 2016.  *Id.* at ¶ 48.  As he explained at deposition, Allen "didn't feel it was fair [he] was being reprimanded for not liking a white guy cracking black jokes."  *See* Allen Dep., at 166:17-19 (Dckt. No. 65, at 165 of 233).  By "reprimanded," Allen clarified that he was upset that Internal Affairs had investigated him.  *Id.* at 167:4-7.

At the end of his investigation, Lieutenant Reid didn't believe that Allen actually perceived the incidents as racist.  *See* Defs.' Statement of Facts, at ¶ 49 (Dckt. No. 64).  So, he

sustained Cochran's allegations (of making malicious, harassing, or frivolous complaints against fellow officers) against Allen. *Id.* At that point, the next step involved figuring out what discipline Allen deserved.

Then, on June 16, 2016, Allen attended a pre-disciplinary meeting with Chief Benton and Lieutenant Reid, as well as a few others. *See* Pl.'s Resp. to Defs.' Statement of Additional Facts, at ¶ 4 (Dckt. No. 98). There, Allen entered into a Last Chance Agreement. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 13 (Dckt. No. 75).

The Last Chance Agreement was Allen's only chance to keep his job. "In lieu of termination, Officer Allen has made a commitment to abide by the terms of this Agreement." *See* Last Chance Agreement, at ¶ 1 (Dckt. No. 68-1, at 10 of 16). "Officer Allen and the Union agree that the terms as set forth in this Agreement are reasonable conditions for Officer Allen to comply with in order for him to save his job and continue his employment as a Police Officer with the City." *Id.* at ¶ 8. Allen agreed to a 15-day suspension. *Id.* at ¶ 2.

The Last Chance Agreement expressly required Allen to withdraw his EEOC charge. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 15 (Dckt. No. 75). "Officer Allen agrees that he will withdraw Equal Employment Opportunity Commission (EEOC) charge No. 4420-2016-09097 within seven (7) days of the date of signing this Agreement. Officer Allen further agrees that he will not file any other charge with any court or administrative agency on the facts underlying the above referenced charge." *See* Last Chance Agreement, at ¶ 6 (Dckt. No. 68-1, at 10 of 16).

The Last Chance Agreement provided that the Police Department would terminate Allen if he didn't comply with or complete the terms, including the withdrawal of the EEOC charge. "Officer Allen and the Union acknowledge and agree that if Officer Allen engages in any of the

following conduct or fails to comply with or complete any one of the requirements specified it constitute[d] 'just cause' for his termination from City employment." *Id.* at ¶ 8.

Less than a week after signing the Last Chance Agreement, Allen attempted to withdraw his EEOC charge of discrimination. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 16 (Dckt. No. 75). He submitted a request to the EEOC to withdraw his charge of discrimination, explaining: "We have reached an agreement." *See* Request for Withdrawal of Charge of Discrimination (Dckt. No. 68-1, at 12 of 16). An attorney for the City later emailed the EEOC, stating that Joliet "agree[d] that Officer Allen [] met his obligation under Paragraph 6 of the parties' Last Chance Agreement by requesting that the EEOC withdraw" his charge. *Id.* at ¶ 17; *see also* 7/6/2016 Email (Dckt. No. 68-1, at 13 of 16).

But the EEOC did not stop its investigation. In fact, it found a basis to conclude that the City had retaliated against Allen. On September 13, 2017, the EEOC found that "the evidence obtained in the investigation establishe[d] a reasonable cause to believe that [the Joliet Police Department] discriminated against [Allen] in retaliation for engaging in protected activity, when [Joliet Police Department] required [Allen] to withdraw the instant EEOC charge of discrimination in lieu of discharge, in violation of Title VII." *See* EEOC Determination, at 1 (Dckt. No. 68-1, at 15 of 16). The EEOC invited the parties to work together to reach a resolution. *Id.*

In June 2018, Allen sued Chief Benton, Lieutenant Reid, and the City of Joliet, bringing two claims. *See* Cplt. (Dckt. No. 1). Count I alleged a violation of Title VII, and Count II alleged a violation of 42 U.S.C. § 1981. *Id.* at Counts I & II. Within both counts, Allen alleged both race discrimination and retaliation. He alleged that Defendants suspended him because of his race, and retaliated against him because of his EEOC complaint.

Allen filed the complaint in June 2018. He didn't last at the Police Department must

long. Internal Affairs investigated Allen in October 2018 for allegedly coming to work

intoxicated. *See* Defs.' Statement of Facts, at ¶ 60 (Dckt. No. 64); Roechner Dep., at 80:12-15

(Dckt. No. 65, at 200 of 233). Then-Chief of Police Alan Roechner ultimately decided to

terminate him. *See* Defs.' Statement of Facts, at ¶ 62.

Allen appealed the termination to the Board of Police and Fire Commissioners, which

effectively made Roechner's decision advisory. *Id.* at ¶ 63; Roechner Dep., at 80:20 – 81:5. But

Allen retired before charges were filed in front of the Commissioners. *See* Defs.' Statement of

Facts, at ¶ 63; Roechner Dep., at 80:6-8.

Discovery followed, and both parties eventually moved for summary judgment.

Defendants moved for summary judgment on all claims under both counts. *See* Defs.' Mtn. for

Summ. J. (Dckt. No. 62). Allen moved for summary judgment on his retaliation claims (only).

*See* Pl.'s Mtn. for Partial Summ. J. (Dckt. No. 66).

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of

establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond

the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving him the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## Analysis

Allen brings claims under section 1981 (Count I) and Title VII (Count II). In each claim, Allen alleges both race discrimination and retaliation. That is, the claim under section 1981 includes allegations of race discrimination and retaliation, and so does the claim under Title VII.

Courts apply the same *prima facie* requirements under both statutes. *See Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 403–04 (7th Cir. 2007) (collecting cases). So, for the sake of simplicity, the Court will consider them together.

Defendants moved for summary judgment on the race discrimination claims and the retaliation claims. Allen moved for summary judgment on the retaliation claims (only).

This Court will address the discrimination claims, and then the retaliation claims. As a preview, this Court grants Defendants' motion for summary judgment on the race discrimination claims. The Court grants in part and denies in part Defendants' motion for summary judgment

on the retaliation claims. The Court denies Allen's motion for summary judgment on the retaliation claims.

## I.    Race Discrimination

The first issue is whether Allen came forward with sufficient evidence to support a jury verdict in his favor on the claims of race discrimination.

In the complaint, Allen alleges that Defendants discriminated against him based on his race in several ways. He mentions that (1) he did not have an opportunity to bid on the sector he wanted; (2) the Lieutenants placed him in the central cover sector, despite his seniority; (3) Lieutenant Reid investigated him for making allegedly frivolous statements about Cochran; (4) Lieutenant Reid sustained Cochran's complaint against him; (5) Chief Benton recommended his termination; (6) his Last Chance Agreement required him to withdraw his EEOC charge in lieu of termination; (7) he received a 15-day suspension; and (8) he remained on central cover for two more years despite his seniority. *See* Cplt., at ¶¶ 12–25 (Dckt. No. 1).

Defendants addressed each of these examples in their motion for summary judgment. *See* Defs.' Mem. in Support of Mtn. for Summ. J., at 5–6 (Dckt. No. 63). That is, Defendants treated the incidents as if Allen was offering each of them as a freestanding basis for a discrimination claim.

Allen seemed to take a different approach in his response brief. He appeared to narrow the number of incidents that are at issue here (meaning the incidents that give rise to a claim), and relegate the rest to the background. *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J. (Dckt. No. 76). By all appearances, Allen seemingly whittled down the case to three adverse actions: (1) the investigation of Allen; (2) the suspension; and (3) the termination. *Id.* at 10–11.

20

Allen's brief does not mention the other discriminatory acts alleged in his complaint, such as the lack of an opportunity to bid on the sector (*see* Cplt., at ¶ 12), his placement in the central cover sector (*see id.* at ¶ 13), and so on. At best, Allen refers to them in oblique fashion. Allen seems to treat the laundry list of events from his complaint as *evidence* of race discrimination – but not as individual, actionable instances of race discrimination in and of themselves. *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 9 (Dckt. No. 76) ("Defendants addressed some of the allegations in Plaintiff's Complaint, albeit in a piecemeal fashion and without considering the totality of the circumstances.").

The Court begins with Allen's termination, but does not consider its merits. The Police Department did eventually terminate Allen.[4] *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 33 (Dckt. No. 95). But Allen never mentioned his termination in his original complaint, for a simple reason: the department hadn't terminated him yet when he filed suit. He filed the complaint in June 2018, and was terminated months later.

He never amended his complaint to include a termination claim, and now is not the time. Allen had more than enough time to seek leave to amend the complaint, if he wanted to expand the boundaries to include a claim about his termination. "[A] plaintiff 'may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.'" *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) (quoting *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002)). So, Allen has no termination claim to bring.

As a result, the Court considers the merits of the two remaining issues: (1) the investigation of Allen; and (2) the suspension.

---

[4] Technically, the Police Department terminated him, and he appealed, so it became advisory, and then he retired.

In ruling on a race discrimination claim at summary judgment, the Court considers "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *see also Igasaki v. Illinois Dep't of Fin. and Prof'l. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021). Here, the Court asks whether a jury could find that Allen's race caused the investigation and suspension of Allen.

Traditionally, a plaintiff could prove race discrimination through the direct method or the indirect method. "A plaintiff proceeds under the direct method of proof by showing 'either direct or circumstantial evidence of intentional racial discrimination.'" *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 (7th Cir. 2016) (citation omitted).

The indirect method involved the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this method, "the plaintiff has the initial burden of producing evidence showing that (1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably." *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016). If the plaintiff establishes those elements, "the burden shift[s] to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.* (cleaned up).

In recent years, the Seventh Circuit has pivoted away from the direct and indirect methods, and has moved toward a more holistic approach to the evidence. "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the

case by itself – or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence." *Ortiz*, 834 F.3d at 765. "Whether a plaintiff offers direct or circumstantial evidence of discrimination, this court made clear in [*Ortiz*] that 'all evidence belongs in a single pile and must be evaluated as a whole.'" *Igasaki*, 988 F.3d at 957 (citing *Ortiz*, 834 F.3d at 766).

Allen claims that Defendants investigated and suspended him because of his race, and he focuses on the indirect method. Following Allen's lead, the Court will first look through the lens of the indirect method, before surveying the evidence as a whole under *Ortiz*.

### A.     The Indirect Method

The Court begins by considering whether Allen came forward with sufficient evidence to support a *prima facie* case of race discrimination about the investigation and the suspension. At that point, the burden would shift to Defendants to give a legitimate, nondiscriminatory reason. If Defendants made that showing, the burden would flip back to Allen to prove that the proffered reason is pretextual. *See Simpson*, 827 F.3d at 661.

The Court concludes that Allen has not presented sufficient evidence to support a *prima facie* case of discrimination. And even if he did, he failed to rebut the legitimate, nondiscriminatory reason given by Defendants.

Allen must prove that (1) he is a member of a protected class, who (2) was meeting his employer's legitimate expectations and (3) suffered an adverse employment action, and (4) similarly situated people outside of his protected class were treated more favorably. *Id.*

Both parties agree that Allen is a member of a protected class. And Defendants do not dispute that Allen was meeting employment expectations. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 4 (Dckt. No. 95); *see also* Breen Dep., at 80:9-16 (Dckt. No. 95-1, at 9 of 27). So, that leaves two prongs: an adverse action, and disparate treatment compared to others.

The Court begins with the adverse action. Allen alleges that the investigation was an adverse action, without offering much of an explanation. *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 11 (Dckt. No. 76) ("[A] reasonable juror could conclude that Reid investigated Allen because of his race . . ."). Allen takes it as a given that the suspension was an adverse action. *See id.* at 10 ("Defendant acquiesced to the evidence that Allen . . . suffered adverse employment actions.").

Defendants argue that the investigation and the suspension don't count as adverse actions. For the investigation, they observe that Allen "focuses almost entirely [on] *how* Defendant Reid conducted the investigation, rather than spending any time on whether the investigation is even an adverse action in the first instance." *See* Defs.' Reply, at 10 (Dckt. No. 94) (emphasis in original). For the suspension, they argue that Allen "*agreed* as part of settlement discussions to accept a 15-day suspension," and that "voluntary nature . . . cannot constitute an adverse employment action." *See* Defs.' Mem. in Support of Mtn. for Summ. J., at 11 (Dckt. No. 63) (emphasis in original).

"A materially adverse employment action is something more disruptive than a mere inconvenience or an alteration of job responsibilities." *Nichols v. S. Illinois Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (cleaned up). The Seventh Circuit has recognized three general categories of adverse actions. *See O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004). First, an employee can suffer an adverse action when "the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination." *Id.* Second, adverse actions take place when an employee's career prospects are damaged. *Id.* And third, an employee experiences an adverse action when "the conditions in which [an

employee] works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment." *Id.*

The investigation falls into none of those categories. In fact, Allen does not even attempt to place the investigation into one of those buckets. He does not allege that the investigation hurt him in any way (beyond the eventual suspension, but that is a different claim). He does not argue that he lost pay or career prospects. And he never suggests that the process was humiliating or degrading.

Instead, Allen focuses entirely on comparisons. He points to several non-black officers who acted inappropriately but were not investigated. *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 11–12 (Dckt. No. 76).

An investigation can, in theory, be discriminatory. For instance, the Seventh Circuit has found that "under circumstances where a drug test is not performed in a routine fashion following the regular and legitimate practices of the employer, but is conducted in a manner that harasses or humiliates employees," an employee might have an actionable Title VII claim. *Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1001–02 (7th Cir. 2000). So, if Lieutenant Reid had conducted an embarrassing or harassing investigation, maybe Allen would have a claim.

But here, Lieutenant Reid investigated the complaint *by* Allen, and then investigated the complaint *against* Allen. The Police Department "investigated the claims against [Allen], just as it had investigated the claims made by [Allen.]" *Balderrama v. Kraft Foods N. Am., Inc.*, 307 F. Supp. 2d 1012, 1014 (N.D. Ill. 2004). He interviewed Allen both times, and gave him a chance to tell his story. *See* Defs.' Statement of Facts, at ¶¶ 38–39, 42 (Dckt. No. 64).

25

And Allen also ignores a key fact about his investigation: Cochran filed a formal complaint with Internal Affairs because of Allen's allegedly false comments. *Id.* at ¶ 41. Lieutenant Reid, as an Internal Affairs investigator, had an obligation to investigate all formal complaints. *Id.* at ¶ 6. He investigated Allen "in a routine fashion following the regular and legitimate practices of the employer." *Stockett*, 221 F.3d at 1001–02.

On this record, the notion that the investigation itself was discriminatory is a particularly difficult sell. Allen complained about Cochran, so the Police Department investigated Cochran. Cochran, in turn, complained about Allen, so the Police Department investigated Allen. The Police Department conducted an investigation when Allen was the *accuser* and when he was the *accused*. So, on its face, there is nothing particularly suspicious about the fact that the Police Department investigated Allen. If anything, it appears even-handed.

So, there is no evidence that the investigation itself was an adverse employment action, and the Court does not need to proceed through the rest of the *prima facie* case for that claim.

Next, the Court turns to the suspension. Allen argues that his suspension is obviously an adverse action. Defendants counter that, because Allen agreed to his suspension, it can't be adverse.

For support, Defendants cite *Yang v. Fedex Freight Inc.*, 2016 WL 3444219, at *7 (N.D. Ill. 2016). But that decision lends little support. In *Yang*, the plaintiff argued that "he was forced to resign, because he had been relieved of duty with no specific return date, and [his employer] suggested to him, in either form or substance, that he move on." *Id.* But the court held that "none of his working conditions he described [were] extraordinary or intolerable" and his "vague suggestion that [he] consider moving on was not sufficient to compel a reasonable person to quit." *Id.*

26

In stark contrast, Allen agreed to a suspension, but only as an option "[i]n lieu of termination." *See* Last Chance Agreement, at ¶ 1 (Dckt. No. 66-1, at 10 of 16). Chief Benton and the Police Department offered him two bad options: termination or suspension. Naturally, Allen chose a suspension, rather than lose his job entirely. Allen chose to lose *something* rather than lose *everything*. But that's not much of a choice.

The last remaining part of a *prima facie* case is evidence that similarly situated employees outside Allen's protected class received better treatment. Allen's argument hinges entirely on the different, less-punitive treatment that non-black officers received, despite their varying levels of more culpable behavior. *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 10–12 (Dckt. No. 76).

"Whether a comparator is similarly situated is 'usually a question for the fact-finder,' and summary judgment is appropriate only when 'no reasonable fact-finder could find that plaintiffs have met their burden on the issue.'" *Coleman v. Donahoe*, 667 F.3d 835, 846–47 (7th Cir. 2012) (quoting *Srail v. Village of Lisle*, 588 F.3d 940, 945 (7th Cir. 2009)). The context of a given case could mean that certain similarities are more relevant than others. But "[i]n the usual case a plaintiff must at least show that the comparators (1) 'dealt with the same supervisor,' (2) 'were subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Id.* at 847 (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)). The goal "is to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable: complaints about discrimination." *Humphries*, 474 F.3d at 405.

Here, Allen presented the Court with a grab-bag of comparators. *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 4–6, 11 (Dckt. No. 76); Pl.'s Statement of Additional Facts, at ¶¶ 12–18 (Dckt. No. 77); *see also* Porcher Dec., at ¶¶ 13–19 (Dckt. No. 99-1). Specifically, he focuses on officers who "were involved in violent acts and received suspensions or no discipline at all." *See* Pl.'s Statement of Additional Facts, at ¶ 17. That is, he claims that the lack of discipline shows that the officers were treated "more favorably" than he was, since he "was suspended and terminated for non-violent conduct." *Id.* But there are a few problems with Allen's claims.

The first problem is that a different Chief of Police disciplined three of the officers: Officers Mau, Busse, and Avila. Since Allen "points to no evidence . . . that any of these persons were disciplined, or not, by the same decisionmaker who made the adverse employment decision in this case," their punishments "shed[] no light on the decision" to suspend Allen. *Little v. Illinois Dep't of Rev.*, 369 F.3d 1007, 1012 (7th Cir. 2004). And in any event, it's hard to see how they received *better* treatment, because they received discipline too.

Mau beat his girlfriend. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 12 (Dckt. No. 95). He also broke a driver-side window, pulled the driver through the window, and beat and tasered the driver without explaining why he pulled him over. *Id.* Chief of Police Michael Trafton issued him a 120-day suspension for the first incident, and Chief of Police Al Roechner issued him a written reprimand for the second. *Id.*

Busse struck his wife in the face and dragged her by the hair. *Id.* at ¶ 13. Roechner gave him a 26-day suspension for the incident. *Id.*[5]

---

[5] Allen claims that Chief Benton gave Busse the suspension. *See* Pl.'s Statement of Additional Facts, at ¶ 13 (Dckt. No. 77). But the evidence that he produced clearly shows that Roechner disciplined Busse. *See* Internal Affairs Review (Dckt. No. 82, at 9 of 108).

Avila failed to appear in court, and then didn't go to work. *Id.* at ¶ 24. When his supervisor asked why he didn't come to work, Avila lied by saying he did go to court. *Id.* Trafton gave him a 15-day suspension. *Id.*

Allen received his discipline from Chief Benton. But those three officers did not. They received discipline from Chief Trafton and Chief Roechner, so they were not similarly situated to Allen. *See Little.*, 369 F.3d at 1012. And in any event, it is not as if they got off scot-free. All three officers received discipline. And their conduct was different than Allen's, too. The most similar case was Avila, but he received a 15-day suspension – just like Allen.

Allen also points to a big collection of other officers, including Amelio, Crowley, Stapleton, Banas, DeVito, Urquidi, Korczak, Harrison, Nagra, Bryne, and Smythe. *See* Pl.'s Statement of Additional Facts, at ¶¶ 14–18, 21–26 (Dckt. No. 77). But their conduct was not similar to Allen's, so they cannot serve as comparators. No reasonable jury could find otherwise.

"Employees are similarly situated if they are directly comparable in all material respects. The inquiry is fact intensive, requiring consideration of the circumstances as a whole" *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006). As stated, one of the "material" facts is whether the comparators "engaged in similar conduct" as the plaintiff. *Coleman*, 667 F.3d at 846–47.

None of these eleven officers engaged in conduct remotely like Allen's. Nine of them committed vastly different actions, which were mostly violent. Amelio displayed a gun to his stepson and stepson's friend. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 14 (Dckt. No. 95). Crowley assaulted his girlfriend and discharged a gun during the assault. *Id.* at ¶ 15. Stapleton threatened a mother with a DCFS hotline call, inappropriately telling her that he

could take her children away. *Id.* at ¶ 16.[6] DeVito fired a gun while driving on the highway, and Urquidi and Korczak caused property damage by discharging their guns. *Id.* at ¶ 21.

The other three employees engaged in different types of misconduct. Harrison had extra-marital affairs with coworkers. *Id.* at ¶ 22. Byrne urinated in broad daylight. *Id.* at ¶ 25. And Smythe slept in his squad car on duty. *Id.* at ¶ 26.

Only two committed conduct involving dishonesty. Banas called the police from her house and reported domestic abuse, but then changed her story when the police arrived. *Id.* at ¶ 18. And Nagra kicked a cab door into an individual and then told the police that he did not know what happened. *Id.* at ¶ 23. But neither of these officers lied about a coworker, during a work meeting, in front of other coworkers. The situations involving Banas and Nagra were more serious, too. Banas reported a crime (which, if untrue, is a crime in and of itself), and Nagra committed battery.

Overall, no reasonable jury could find these officers "directly comparable in all material respects." *Raymond*, 442 F.3d at 610. Each is distinct in material ways, from the degree of violence to the level of unprofessionalism. Without the ability to point to similarly situated individuals, Allen cannot prove his *prima facie* case.

Even if he had proved his *prima facie* case, Allen does not respond to Defendants' legitimate, nondiscriminatory reason for the suspension. Defendants explain that they conducted the pre-disciplinary hearing that led to Allen's suspension "in order to address their legitimate belief that Plaintiff had lied about Officer Cochran's conduct due to a personal gripe about being

---

[6] Allen claims that Stapleton also "tackled a black woman at a prayer vigil" and received no punishment. *See* Pl.'s Statement of Additional Facts, at ¶ 16 (Dckt. No. 77). But the evidence he provided tells a different story. Stapleton apparently pushed a woman at a traffic stop, after she "swung her arm in an attempt to strike him." *See* Notice of Complaint Disposition (Dckt. No. 82, at 43–44 of 108). He received no punishment because Internal Affairs determined that he did not use unnecessary force. *Id.*

moved to a different sector." *See* Defs.' Mem. in Support of Mtn. for Summ. J., at 12 (Dckt. No. 63); *see also* Defs.' Statement of Facts, at ¶ 59 (Dckt. No. 64) ("Chief Benton decided to suspend Plaintiff for 15 days based on his belief that Plaintiff had intentionally and falsely accused Cochran of making racist jokes and comments.").

Because Defendants produced a legitimate, nondiscriminatory reason for Allen's suspension, the burden shifts back to Allen to prove that reason was pretextual. Allen's response entirely relied upon his allegedly similarly situated individuals.

Again, those individuals were not similarly situated. But even if they were, they do not prove pretext. Allen does not explain whether those individuals had formal complaints against them (like Allen did) that led to their punishment (or lack thereof). So, they do not shed much light on whether Defendants' legitimate reason "is a lie, specifically a phony reason for some action." *Barnes v. Bd. of Trs. of Univ. of Illinois*, 946 F.3d 384, 389–90 (7th Cir. 2020) (cleaned up). As such, the Court has an independent reason to decide that Allen failed to meet his burden under the indirect method. There is no evidence of pretext.

As a result, Allen has not come forward with sufficient evidence under the indirect approach to support a verdict in his favor by a reasonable jury.

### B. The Holistic Approach

The answer is no different after viewing the evidence from a different vantage point, with a wide-angle lens. The Seventh Circuit encourages district courts to look at the evidence as a whole, from a big-picture perspective. "[The] legal standard . . . is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge or other adverse employment action. Evidence must be considered as a whole, rather than asking

whether any particular piece of evidence proves the case by itself – or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Ortiz*, 834 F.3d at 765.

But under that approach, Allen fares no better. Allen's entire case relies on his proposed comparators. He basically claims that he received worse treatment than other, similarly situated officers. For the reasons stated above, no reasonable jury could look at the treatment of other officers and conclude that the department suspended Allen because of his race.

The Court grants Defendants' motion for summary judgment on Allen's claims of race discrimination in Count I and Count II.

## II.    **Retaliation**

The next issue is retaliation. As a reminder, Allen included a retaliation theory under both Count I (under Title VII) and Count II (under 42 U.S.C. § 1981). The parties filed cross motions for summary judgment on the retaliation claims.

To prevail on a retaliation claim, a plaintiff must prove that "(1) he engaged in an activity protected by the statute; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action." *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018). Plaintiffs traditionally used the direct and indirect methods to prove retaliation claims (like discrimination claims). The Seventh Circuit has "clarified that there are not separate classifications of evidence to be evaluated under different standards." *Id.* at 866–67.

Once again, Allen's complaint seems to paint with a broader brush than his summary judgment filings. In his summary judgment filings, Allen narrowed things down. At the Court understands it, the retaliation claims involve (1) Lieutenant Reid's investigation of Allen; (2) the Last Chance Agreement; and (3) the suspension.

The Court will begin by considering the Last Chance Agreement, and then the investigation and the suspension.

### A.      The Last Chance Agreement

The first question is whether the Defendant retaliated against Allen for complaining about racism in the workplace when the parties entered into the ominous-sounding Last Chance Agreement.

Again, the Last Chance Agreement allowed Allen to keep his job, with strings attached. For present purposes, the most important string was the obligation to abandon the EEOC charge. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 15 (Dckt. No. 75). "Officer Allen agrees that he will withdraw Equal Employment Opportunity Commission (EEOC) charge No. 4420-2016-09097 within seven (7) days of the date of signing this Agreement. Officer Allen further agrees that he will not file any other charge with any court or administrative agency on the facts underlying the above referenced charge." *See* Last Chance Agreement, at ¶ 6 (Dckt. No. 68-1, at 10 of 16).

There is no dispute about the first element of the retaliation claim, because there is no doubt that filing a complaint with the EEOC is a protected activity. The Seventh Circuit has long held that "formal EEOC charges are the most obvious form of statutorily protected activity." *See Lewis*, 909 F.3d at 867 (cleaned up).

But the parties do disagree about the next two elements. That is, they argue about whether Allen suffered an adverse employment action, and whether there was a causal connection between the EEOC charge and the adverse action.

"[A] materially adverse action 'need not be one that affects the terms and conditions of employment, but it must be one that a reasonable employee would find to be materially adverse

such that the employee would be dissuaded from engaging in the protected activity.'" *Id.* at 867 (quotation marks omitted) (quoting *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016)).

Laws against retaliation "protect[] an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). They do not "protect an employee against 'petty slights or minor annoyances that often take place at work and that all employees experience.'" *Lewis*, 909 F.3d at 867–68 (quoting *Burlington N.*, 548 U.S. at 68).

Empty threats do not count as retaliation. The Seventh Circuit has held that an "employer's unfulfilled 'threats of unspecified disciplinary action' did not constitute adverse actions, though such threats 'may well be relevant evidence of retaliatory intent behind a more concrete adverse action.'" *Id.* at 868 (quoting *Poullard*, 829 F.3d at 856–57). "[T]hreats of future discipline can cause stress or worry," but fall closer to "petty slights or minor annoyances" than actual injury or harm. *Poullard*, 829 F.3d at 857.

That said, the Seventh Circuit has "left open 'the possibility that a plaintiff could argue that a singular threat of termination had the impact of dissuading a reasonable worker from supporting a discrimination complaint.'" *Id.* at 857 n.3 (quoting *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 681 n.2 (7th Cir 2010)). "[T]his is simply a reflection of the Supreme Court's instruction that 'the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters.'" *Id.* (quoting *Burlington N.*, 548 U.S. at 69).

Here, Allen faced a threat of termination. That threat was not left to Allen's imagination. Far from it – the Police Department made it loud and clear to Allen that he would lose his job if he did not drop the EEOC charge.

34

The Last Chance Agreement explicitly stated that "[i]n lieu of termination, Officer Allen has made a commitment to abide by the terms of this Agreement." *See* Last Chance Agreement, at ¶ 1 (Dckt. No. 66-1, at 10 of 16). The Agreement later doubled-down, reiterating that Allen "acknowledge[d] and agree[d] that if Officer Allen . . . fail[ed] to comply with or complete any one of the requirements specified it constitutes 'just cause' for his termination from City employment." *Id.* at ¶ 8. The phrase "any of the requirements" necessarily included the obligation to drop the EEOC complaint, which appeared two paragraphs earlier. *Id.*

The very name of the contract – the *Last Chance* Agreement – said it all. The Police Department gave Allen one last chance to keep his job. He needed to do everything covered by the Last Chance Agreement, or his days on the police force were over. The threat of termination couldn't have been more direct or more dire. In effect, the agreement basically said: "Do X or we'll fire you."

Faced with termination as his only alternative, Allen did what he agreed to do, and dropped the EEOC complaint. A city attorney then emailed the EEOC to confirm that Defendants "agree[d] that Officer Allen [] met his obligation under Paragraph 6 of the parties' Last Chance Agreement by requesting that the EEOC withdraw" his charge. *See* 7/6/2016 Email (Dckt. No. 68-1, at 13 of 16).

The possible adverse action was not abstract, general, and unspecified, either. *See Lewis*, 909 F.3d at 868. Instead, it was a specific, "singular threat of termination." *Poullard*, 829 F.3d at 857 n.3. That sort of threat certainly might "dissuad[e] [an employee] from engaging in the protected activity" of filing an EEOC complaint in the first place. *Lewis*, 909 F.3d at 867.

In response, Chief Benton applies a thick coat of interpretative gloss on the Last Chance Agreement. Chief Benton submitted a declaration saying that he never intended to force Allen to

35

withdraw his EEOC charge through a threat of termination. *See* Defs.' Statement of Additional Facts, at ¶¶ 19–22 (Dckt. No. 75); Benton Dec., at ¶¶ 12–13 (Dckt. No. 75-1, at 5 of 50); Benton Resp. Dec., at ¶¶ 11, 13 (Dckt. No. 75-1, at 8 of 50). And he would have dropped this provision if Allen had asked. *Id.*

Chief Benton says that he understood the agreement to threaten termination if and only if Allen engaged in similar misconduct in the future (meaning making false accusations against coworkers). *See* Defs.' Statement of Additional Facts, at ¶ 22 (Dckt. No. 75); Benton Resp. Dec., at ¶ 14 (Dckt. No. 75-1, at 8 at 50). And Chief Benton also says that he would never have fired Allen if he did not withdraw the EEOC charge. *See* Benton Resp. Dec., at ¶ 16.

But the Agreement says what it says, and the language is plain as day. Allen needed to "abide by the terms of this Agreement" to keep his job. *See* Last Chance Agreement, at ¶ 1 (Dckt. No. 66-1, at 10 of 16). "Officer Allen and the Union agree that the terms as set forth in this agreement are reasonable conditions for Officer Allen to comply with *in order for him to save his job and keep him employment* as a Police Officer with the City." *Id.* at ¶ 8 (emphasis added). One of those "conditions" was dropping the EEOC complaint. *Id.*

The Agreement wasn't a long-winded contract where the details could get lost in the minutiae. The Agreement was only two pages long, spanning eleven paragraphs. And an entire paragraph was devoted to the withdrawal of the EEOC charge. *Id.* at ¶ 6. No one could miss it on the middle of page one.

Maybe Chief Benton was bluffing, and never intended to carry through with the threat of terminating Allen if he didn't withdraw the EEOC charge. He can make that argument to the jury if he wants. But based on the plain text, there is more than enough in the record to support a

finding by a reasonable jury that Allen faced a real threat of termination for complaining to the EEOC.

The Seventh Circuit has made clear that context matters. *See Poullard*, 829 F.3d at 857 n.3. Maybe this provision was a mere threat, and no one intended to follow through. So, for that reason, the Court denies Allen's motion for summary judgment, too.

On this record, a jury needs to decide if the Police Department retaliated against Allen for complaining to the EEOC. And a jury can determine if there was a causal connection between the EEOC charge and the adverse action. The cross motions for summary judgment are denied.

### B.    The Investigation

Allen claims that "a reasonable juror could conclude that Reid investigated Allen . . . in retaliation for Allen's protected activity." *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 10 (Dckt. No. 76).

But Allen filed his EEOC complaint *after* the investigation began, and he testified that the investigation was *why* he filed the complaint. *See* Allen Dep., at 166:17 – 167:7 (Dckt. No. 65, at 165 of 233). Allen has the timeline and causation backward here – and admits as much in his deposition.

The investigation couldn't be a retaliation for the EEOC complaint when the investigation came before the EEOC complaint. The Court grants Defendants' motion for summary judgment for the retaliation claims about the investigation.

### C.    The Suspension

Allen also claims that the department suspended him in retaliation for his EEOC charge. *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 10 (Dckt. No. 76).

His argument rests entirely on the "compar[ison] to officers outside Allen's protected class." *Id.* He makes no arguments about "suspicious timing, ambiguous statements oral or written," or "other bits and pieces from which an inference of retaliatory intent might be drawn." *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 643 (7th Cir. 2013) (cleaned up).

But, as discussed in detail above, Allen did not provide adequate comparators. He did not find people who "eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel." *Humphries*, 474 F.3d at 405. The record does not reveal whether any of the other officers submitted an EEOC charge, either. So there is no evidence whether anyone else received a suspension after complaining to the EEOC.

The Court grants Defendants' motion for summary judgment on his suspension claim.

### Conclusion

For the foregoing reasons, the Court grants Defendants' motion for summary judgment on the race discrimination claims. The Court also grants Defendants' motion for summary judgment on the retaliation claims about the investigation and the suspension. The Court denies Defendants' motion for summary judgment on the retaliation claims about the Last Chance Agreement. The Court also denies Allen's motion for partial summary judgment.


Date:   February 25, 2022          _____

                                   Steven C. Seeger
                                   United States District Judge